Avonelle F. Leissring, Plaintiff-Appellant,

v.

Department of Industry, Labor & Human Relations, Defendant-Respondent,

Hamilton School District, Defendant.
[Case No. 82–1409.]

Richard C. Frey, Plaintiff-Respondent,

v.

Department of Industry, Labor & Human Relations, Defendant-Appellant,

Juda School District, Defendant.
[Case No. 82–1913.]

Supreme Court

*Nos. 82–1409, 82–1913. Argued October 31, 1983.—
Decided November 30, 1983.*

(Also reported in 340 N.W.2d 533.)

476

For the plaintiff-appellant and plaintiff-respondent there were briefs and oral argument by *Bruce Meredith*, staff counsel for the Wisconsin Education Association Council, and on the brief in 82–1913, was *Jeanine S. Larson*, all of Madison.

For the defendant-respondent and defendant-appellant there were briefs and oral argument by *Earl G. Buehler,* Madison.

WILLIAM A. BABLITCH, J. This is a consolidation of two cases. In case no. 82–1409, Avonelle Leissring appeals from a judgment of the circuit court for Waukesha county that Leissring is ineligible for unemployment compensation benefits in weeks 24 through 34 (summer) of 1979. In case no. 82–1913, the Labor and Industry Review Commission (LIRC) appeals from a judgment of the circuit court for Rock county that Richard Frey was eligible for unemployment compensation benefits in weeks 23 through 34 (summer) of 1981. The holdings in these cases were based on differing interpretations of sec. 108.04(17)(a), Stats. The court of appeals certified both cases, and we accepted the certifications.

The issue is whether a fulltime public school teacher who is laid off at the end of the school year and is then offered for the following year either a place on a substitute teaching list with no guaranteed wages or hours (Leissring), or a contract to teach only one hour per day for substantially reduced wages (Frey), has a "reasonable assurance that [he or she] will perform services in any such capacity" within the meaning of sec. 108.04(17)(a), Stats., so as to be ineligible for unemployment compensation benefits during the intervening summer period.

We hold that neither Leissring nor Frey had a "reasonable assurance that [he or she] will perform services in any such capacity" within the meaning of sec. 108.04(17)(a), Stats., and they are therefore not disqualified under that provision from receiving unemployment compensation benefits during the intervening summer period.

Avonelle Leissring was employed by the Hamilton School District as a fulltime elementary school teacher

from January 3, 1979 to June 9, 1979. Under the terms of a contract Leissring had signed in December, 1978, she received a base salary of $8,023.05 for 105 days.

In February, 1979, the Hamilton School Board notified Leissring pursuant to sec. 118.22(3), Stats.,[1] that it was considering nonrenewal of her contract for the 1979–80 school year. On March 12, 1979, the board voted not to renew Leissring's contract. On March 13, the district informed Leissring that her contract would not be renewed because of declining enrollment, and indicated that the nonrenewal should be considered a layoff under the terms of the collective bargaining agreement in effect between the school district and the union representing Leissring.

Leissring received a letter from the district administrator on May 11, 1979, stating that she would be laid-off. The letter also indicated that although no contracted staff openings existed, ". . . [w]e [the school district] expect to offer you the opportunity to perform services in some instructional capacity in the fall school term." The school principal and superintendent subsequently told Leissring that her only possibility for employment in the fall would be as a substitute teacher. The record indicates that in the Hamilton School District, substitute teachers do not sign a contract but are placed on a list and called as needed. Although Leissring was notified that she would be placed on a substitute teaching list, she

[1] Section 118.22(3), Stats., provides: "At least 15 days prior to giving written notice of refusal to renew a teacher's contract for the ensuing school year, the employing board shall inform the teacher by preliminary notice in writing that the board is considering nonrenewal of the teacher's contract and that, if the teacher files a request therefor with the board within 5 days after receiving the preliminary notice, the teacher has the right to a private conference with the board prior to being given written notice of refusal to renew his contract."

was not informed how often she might be called to substitute or the rate of compensation she would receive.

After June 9, 1979, Leissring's last day of work under her contract, she applied for unemployment compensation benefits. The Department of Industry, Labor and Human Relations (DILHR) initially determined that Leissring was eligible for such benefits during weeks 24 through 34 of 1979, which was the summer period. The Hamilton School Board appealed that decision to the appeal tribunal of DILHR. The appeal tribunal found that because Leissring had been placed on a substitute teaching list for the 1979–80 academic term, she had a reasonable assurance of performing services in the second academic term and was therefore ineligible for unemployment compensation benefits for weeks 24 through 34 of 1979 under sec. 108.04(17) (a), Stats. It reversed the initial eligibility determination.

Leissring appealed to LIRC, which affirmed the appeal tribunal's decision denying her benefits. Leissring sought review of LIRC's decision in the circuit court pursuant to secs. 108.09(7) and 102.23, Stats. The court affirmed the decision. Leissring appealed to the court of appeals, which certified the case to this court.

Richard Frey was employed for five years by the Juda School District as a high school teacher until June 1, 1981. During the 1980–81 academic term, Frey taught social studies and driver education, and was employed fulltime plus one extra hour per day of behind the wheel driver training. Under the terms of his 1980–81 contract, Frey received approximately $19,000 in salary plus substantial fringe benefits.

In February, 1981, Frey received preliminary notification that his contract might not be renewed for the 1981–82 academic term due to declining enrollment. Frey received a final notice of nonrenewal of his contract in March, 1981. In May, the district offered Frey a contract

for a one-eighth time position teaching driver education during the 1981–82 academic term. The contract specified that he would teach for one hour per day, and would receive $2,166.25 in salary plus payment by the district of one-eighth the premium cost of his hospital, medical and dental insurance. The contract also provided for a forfeiture of $300.00 as liquidated damages if Frey breached the contract.

In order to fulfill his duties under the proposed contract, Frey would have had to travel a distance of 60 miles round trip to work the required one hour per day. Because of this factor, his dissatisfaction with the liquidated damages provision, and his desire to obtain full-time employment, Frey did not accept the contract. After June 1, 1981, Frey's last day of work under his 1980–81 contract, he applied for unemployment compensation benefits.

DILHR made an initial determination that Frey was ineligible for benefits under sec. 108.04(17)(a), Stats., for weeks 23 through 34 of 1981. Frey appealed the decision to the appeal tribunal, which affirmed the initial determination. Frey appealed to LIRC, which affirmed the appeal tribunal's decision. Frey subsequently sought review in the circuit court, pursuant to secs. 108.09(7) and 102.23. The court reversed, holding that Frey did not have a "reasonable assurance" of a teaching position within the meaning of sec. 108.04(17)(a), and remanded to LIRC. LIRC appealed to the court of appeals, which certified the case to this court.

The issue in both cases involves the interpretation of sec. 108.04(17)(a), Stats., which is a question of law. Although the reviewing court will give weight to the interpretation of a statute by the agency charged with its application, we are not bound by that interpretation. *See Nottelson v. DILHR,* 94 Wis. 2d 106, 115–17, 287 N.W.2d 763 (1980). We have the power in the first

instance to determine whether the standard or policy choice used by the agency comports with the statutory purpose. *Milwaukee Transformer Co. v. Industrial Commission,* 22 Wis. 2d 502, 511, 126 N.W.2d 6 (1964).

Section 108.04(17)(a), Stats. 1981–82, provides:

"EMPLOYES OF EDUCATIONAL INSTITUTIONS. (a) An employe of a nonprofit or public educational institution who performs services in an instructional, research or principal administrative capacity is ineligible for benefits based on such services for any week of unemployment which occurs during a period between 2 successive academic years or 2 regular terms, whether or not successive, if such employe performed such services in the first such academic year or term and if there is a contract or a reasonable assurance that such employe will perform services in any such capacity as an employe of a nonprofit or public educational institution in the 2nd such academic year or term."

LIRC contends that the statutory language is unambiguous, and that the statute clearly denies unemployment compensation benefits to teachers over the summer period between academic years if they have a reasonable assurance of performing *any* amount of services in an instructional, research or principal administrative capacity during the following year. LIRC argues that sec. 108.04 (17)(a), does not require that the amount or terms of the offered employment be the same as or even substantially similar to those of the preceding year.

Leissring and Frey contend that sec. 108.04(17)(a), Stats., is ambiguous, and should be interpreted to deny benefits over an intervening summer period only if a teacher who is employed fulltime during the first year is offered employment during the second year having wages, hours, and conditions that are substantially or reasonably similar to those of the preceding year. Leissring asserts that the under this interpretation, the school district's offer to place her on a substitute teach-

ing list with no guarantee that she would work any hours or receive any wages does not constitute a reasonable assurance of performing services under sec. 108.04(17)(a). Similarly, Frey contends that he did not have a reasonable assurance of performing services within sec. 108.04(17)(a) because an offer to teach only one hour per day is not similar to the terms and conditions of his prior fulltime employment.

In construing a statute, the primary objective is to achieve a reasonable construction that will effectuate the statutory purpose. *State ex rel. Melentowich v. Klink,* 108 Wis. 2d 374, 380, 321 N.W.2d 272 (1982). When a statute is clear on its face, we may not look beyond the statutory language to determine the intended meaning. *See Wisconsin Electric Power Co. v. Public Service Commission,* 110 Wis. 2d 530, 534, 329 N.W.2d 178 (1983). If the statute is ambiguous, however, we may resort to extrinsic aids to arrive at the legislative intent. *State v. Stepniewski,* 105 Wis. 2d 261, 268, 314 N.W.2d 98 (1982). The test of statutory ambiguity is whether reasonably well-informed individuals could understand the statute in two or more senses. *Wirth v. Ehly,* 93 Wis. 2d 433, 441, 287 N.W.2d 140 (1980).

We conclude that sec. 108.04(17)(a), Stats., is susceptible to more than one reasonable interpretation and is therefore ambiguous. The phrase "a reasonable assurance that such employe will perform services in any such capacity" could mean a reasonable assurance of performing *any* instructional, reasearch or principal administrative services for the following year, regardless of how similar or dissimilar they are in terms of wages, hours, and conditions to the services the teacher performed during the preceding year. Alternatively, the phrase may refer not only to the type of services performed (i.e., instructional, research, or principal admin-

istrative), but also to the terms and conditions of the offered employment and their relationship to the terms and conditions of the teacher's employment in the prior year. Because the statute is capable of more than one reasonable construction, we must ascertain the legislative intent from the statutory language in relation to its scope, history, context, subject matter and object intended to be accomplished. *Terry v. Mongin Insurance Agency,* 105 Wis. 2d 575, 584, 314 N.W.2d 349 (1982).

In enacting The Wisconsin Unemployment Act, ch. 108, Stats., the legislature recognized a need to ameliorate the economic hardship and social costs of unemployment. *See* sec. 108.01. Chapter 108 therefore requires that unemployment compensation benefits be provided to any eligible person considered to be unemployed, unless that individual falls within a disqualifying provision. In construing sec. 108.04(17)(a), we must read the disqualifying language with the general purpose of ch. 108 in mind.

The provisions of ch. 108, Stats., are substantially influenced by provisions of the Federal Unemployment Tax Act, 26 U.S.C. sec. 3301–3311. The federal act provides substantial tax credits to employers in states that administer unemployment compensation benefits in accordance with federal guidelines. *See* 26 U.S.C. sec. 3302.

Prior to 1970, most employes of educational institutions were not required to be covered under unemployment compensation benefit programs. In 1970, Congress adopted the Employment Security Amendments of 1970, Pub. L. 91–373, 84 Stat. 695, which extended unemployment compensation coverage to employes of state institutions of higher education, including faculty, research and administrative employes. This legislation also amended sec. 3304(a) of the Internal Revenue Code of 1954 to provide that no compensation would be available for the period between two successive academic years

based on services performed in an instructional, research, or principal administrative capacity, if an individual had a contract to perform services in any such capacity for any institution of higher education for both academic years. A Senate Finance Committee report indicates that under this amendment, ". . . faculty, research, and administrative employees of institutions of higher education would not be considered unemployed during the summer vacation if they have a contract to *resume* work after the summer vacation." (Emphasis added.) S. Rep. No. 752, 91st Cong., 2d Sess. (1970), *reprined in* U.S. Code Cong. & Ad. News 3606, 3609.

In response to this federal legislation, the Wisconsin Legislature enacted sec. 108.04(17), Stats. 1971, which provided:

"SERVICE FOR AN INSTITUTION OF HIGHER EDUCATION. An employe who has a contract or contracts to perform services in any institution of higher education in an instructional, research or principal administrative capacity for each of 2 successive academic years or for 2 regular terms, whether or not successive, shall not be eligible to receive benefits based on such services for any week of unemployment which begins between such periods or during a period of leave between such periods which is provided for in his contract."

In 1973, the legislature enacted ch. 247, Laws of 1973, which extended unemployment compensation coverage to employes of all school districts, including primary and secondary education employes.

In 1975, Congress passed the Emergency Compensation and Special Unemployment Assistance Extension Act of 1975, Pub. L. 94-45, 89 Stat. 236. This act extended special employment assistance coverage to state and local government employes not already covered by state unemployment compensation programs. In addition, sec. 202 amended sec. 203 of the Emergency Jobs and Unem-

ployment Assistance Act of 1974, Pub. L. 93–567, 88 Stat. 1845. A Senate Committee on Labor and Public Welfare report described this amendment as follows:

"Section 202 amends section 203 of the Emergency Jobs and Unemployment Assistance Act of 1974 to provide for the denial of assistance during periods occurring between school terms or academic years to certain employees of educational institutions who performed service[s] during the first term or year in an instructional, research, or principal administrative capacity, if they have contracts to perform such services for the later term or year for an educational institution or agency." S. Rep. No. 208, 94th Cong., 1st Sess. (1975), *reprinted in* U.S. Code Cong. and Ad. News 377, 386.

In 1976, Congress enacted the Unemployment Compensation Amendments of 1976, Pub. L. 94–566, 90 Stat. 2667, which required states to provide unemployment compensation coverage to employes of nonprofit elementary and secondary schools, in addition to the coverage already required for employes of institutions of higher education. The act also amended sec. 3304(a)(6) of the Internal Revenue Code of 1954 to provide that compensation based on services performed in an instructional, research, or administrative capacity shall not be payable based on such services during a period between two successive academic years if the individual performed such services in the first year and if there is a contract or reasonable assurance that the person will perform services in any such capacity for any educational institution in the second year. A house conference report provides, in part:

"The conference agreement provides that unemployment compensation based on services performed for an educational institution shall be denied to a teacher or other professional employee during periods between academic years or terms if there is a contract or reasonable assurance that the individual will perform *such services*

in the forthcoming academic year or term." (Emphasis added.) H.R. Rep. No. 1745, 94th Cong., 2d Sess. (1976), *reprinted in* U.S. Code Cong. & Ad. News 5997, 6036.

The report also states that ". . . the term 'reasonable assurance' means a written, verbal, or implied agreement that the employee will perform services in the *same capacity* during the ensuing academic year or term. . . ." (Emphasis added.) *Id.*

In order to comply with Pub. L. 94–566, the Wisconsin Legislature passed ch. 133, Laws of 1977. This legislation amended sec. 108.04(17), Stats., to provide:

"EMPLOYES OF EDUCATIONAL INSTITUTIONS. (a) An employe who performs services for a nonprofit or public educational institution in an instructional, research, or principal administrative capacity is ineligible for benefits based on such services for any week of unemployment which occurs during a period between 2 successive academic years or 2 regular terms, whether or not successive, if such employe performed such services in the first such academic year or term and if there is a contract or a reasonable assurance that such employe will perform services in any such capacity for a nonprofit or public educational institution in the 2nd such academic year or term."

An analysis by the Legislative Reference Bureau accompanying AB 938 (1977) states, in part:

"This bill makes a number of changes to maintain continued conformity with federal law requirements, which were changed by enactment of the Unemployment Compensation Amendments of 1976, Public Law 94–566. The bill's changes include the following:
". . .
"3. *Benefits—*
". . .
"-substitutes a 'between-terms' benefit denial for public and nonprofit teachers and other school workers who have return-to-work assurance, in place of the present blanket denial. . . ."

Section 108.04 (17) (a) was subsequently amended by ch. 36, Laws of 1981, and by 1983 Wis. Act 8, both of which made only minor revisions.[2]

It is clear that Congress and the Wisconsin Legislature intended that public school teachers, like other state and governmental employes, receive unemployment compensation benefits if eligible. It is also clear that sec. 108.04 (17) (a), Stats., does not totally prohibit teachers from receiving unemployment compensation benefits during a summer period between academic years. The legislative history of sec. 108.04 (17) (a), and the federal provisions on which it is based, indicate that the intent

---

[2] Section 108.04 (17) (a), Stats., was amended by ch. 36, Laws of 1981, to provide:

"EMPLOYES OF EDUCATIONAL INSTITUTIONS. (a) An employe of a nonprofit or public educational institution who performs services in an instructional, research, or principal administrative capacity is ineligible for benefits based on such services for any week of unemployment which occurs during a period between 2 successive academic years or 2 regular terms, whether or not successive, if such employe performed such services in the first such academic year or term and if there is a contract or a reasonable assurance that such employe will perform services in any such capacity as an employe of a nonprofit or public educational institution in the 2nd such academic year or term."

This section was subsequently amended by 1983 Wis. Act 8, to provide:

"An employe of a nonprofit or public educational institution or an employe who provides services to or on behalf of such an institution and who perform services in an instructional, research or principal administrative capacity is ineligible for benefits based on such services for any week of unemployment which occurs during a period between 2 successive academic years or 2 regular terms, whether or not successive, if such employe performed such services in the first such academic year or term and if there is a contract or a reasonable assurance that such employe will perform services in any such capacity as an employe of a nonprofit or public educational institution in the 2nd such academic year or term."

of the limited disqualification in sec. 108.04(17)(a) is to prevent subsidized summer vacations for those teachers who are employed during one academic year and who are reasonably assured of resuming their employment the following year. There is no indication that the legislature intended the disqualification in sec. 108.04(17)(a) to apply to a teacher employed fulltime who become unemployed at the end of the academic year, and whose only prospect of employment at that time is not a continuation of his or her previous contract, but merely an offer of substitute teaching with no guarantee of any hours or wages, or a position having substantially decreased wages and hours.

Given the history of sec. 108.04(17)(a), Stats., and the general purpose of ch. 108, we hold that the phrase "reasonable assurance that such employe will perform services in any such capacity" in sec. 108.04(17)(a) applies to a teacher employed fulltime who is laid off at the end of the academic year only if: 1) he or she has a reasonable assurance of performing services the following year in an instructional, research, or principal administrative capacity; *and* 2) if the terms and conditions of the employment for the following year are reasonably similar to those of the teacher's employment in the preceding year. To interpret sec. 108.04(17)(a) as disqualifying the teacher if he or she merely has some assurance of performing *any* instructional, research, or principal administrative services the following year, no matter how minimal the wages, hours and benefits might be in comparison to the teacher's wages, hours, and benefits of the preceding year, is not supported by the legislative history, and is contrary to the general purpose of ch. 108.

A teacher previously employed fulltime who becomes unemployed at the end of an academic year, and whose

only employment prospect for the following year is a substitute teaching position involving no guaranteed hours or wages, or a position having a substantial decrease in hours and earning capacity, is immediately confronted with a potential need to find alternative means of economic support. In addition, that individual may need to seek another teaching position in a severely restricted job market. If the teacher wants to secure another fulltime position for the next academic year, he or she must utilize the summer months for this job search, and will need economic aid for this purpose as well. This teacher is confronting a far different situation than the teacher who can look forward to resuming his or her fulltime employment in the fall. If the latter individual seeks unemployment compensation benefits over the summer period, it is possible that he or she is merely seeking a subsidized summer vacation, which sec. 108.04(17)(a), Stats., is intended to prevent. The former teacher, who is unemployed at the end of the year, and realistically may remain unemployed in the fall, is not seeking benefits simply because he or she wants a subsidized summer vacation. Such benefits would likely to needed to meet current and future living expenses and to defray the expenses of seeking new employment. These are precisely the type of circumstances for which unemployment compensation has traditionally been intended. It is unreasonable to assume that this need for unemployment compensation benefits will not arise until the summer period ends.

An interpretation of sec. 108.04(17)(a), Stats., as requiring a reasonable assurance of employment in the following year with terms, benefits, and conditions that are reasonably similar to those of the preceding year, is also consistent with other provisions of ch. 108. Section 108.-04(8)(a) provides, in part: "An employe who fails either to apply for work when notified by a public em-

ployment office or to accept work when offered shall, if the failure was without good cause as determined by the department, be ineligible for the week in which such failure occurs and thereafter. . . ." Section 108.04(8)(b) states, in part: "An employe who fails to return to work with a former employer who has duly recalled the employe . . . shall, if the failure was without good cause as determined by the department, be ineligible for benefits from that employer's account for the week in which such failure occurs and thereafter. . . ." Section 108.04(8)(c) provides:

"An employe shall have good cause under par. (a) or (b) if the department determines that the failure related to work at a lower grade of skill or significantly lower rate of pay than applied to the employe on one or more recent jobs, and that the employe had not yet had a reasonable opportunity, in view of labor market conditions and the employe's degree of skill, but not to exceed 6 weeks after the employe became unemployed, to seek a new job substantially in line with the employe's prior job skill and rate of pay."

Section 108.04(9), Stats., provides, in part:

"PROTECTION OF LABOR STANDARDS. Benefits shall not be denied under this chapter to any otherwise eligible individual for refusing to accept new work under any of the following conditions:

". . .

"(b) If the wages, hours (including arrangement and number) or other conditions of the work offered are substantially less favorable to the individual than those prevailing for similar work in the locality. . . ."

It is inconsistent to allow a teacher to retain benefit eligibility when he or she refuses substandard employment or employment having substantially reduced wages and hours, yet deny eligibility to the teacher during the summer period simply because he or she was offered the possibility of employment with substantially less favorable

terms and conditions than those of the teacher's previous employment.

It is also a cardinal rule of statutory construction that a statute must be construed to avoid absurd or unreasonable results. *See State v. Clausen,* 105 Wis. 2d 231, 245, 313 N.W.2d 819 (1982). To construe sec. 108.04 (17) (a), Stats., as LIRC urges would lead to unreasonable results that the legislature could not have intended.

Under LIRC's interpretation, a teacher employed full-time who is laid off at the end of an academic year and who is offered no position for the following year would not be disqualified from benefits during the summer period under sec. 108.04 (17) (a), Stats. However, another teacher employed fulltime who is also laid off at the end of the year but who is offered a position for the following year teaching only one class for one hour per day would be ineligible for benefits. The teacher who received no offer of employment is immediately in a better economic position to support his or her family and seek other employment because he or she would not have a three month waiting period prior to receiving unemployment compensation benefits. For all practical purposes, however, the teacher who is offered a position teaching only one hour per day is in the same situation as the teacher who is offered no employment, and has the same economic need to immediately receive benefits.

Finally, if sec. 108.04 (17) (a), Stats., is construed as LIRC urges, a school district could easily avoid the payment of unemployment compensation benefits during an intervening summer period by simply offering a teacher who previously had a contract for fulltime employment a de minimus contract to teach only one hour per day, or the possibility of substitute teaching with no guarantee of steady employment or a regular source of income. To allow an employer the opportunity to avoid liability for unemployment compensation benefits by merely offering

some possibility of employment, no matter how minimal, creates the potential for abuse and is contrary to the general purpose of ch. 108.

In applying sec. 108.04 (17) (a), Stats., to the facts of these cases, we conclude that LIRC erroneously determined that Leissring and Frey were ineligible under that provision for unemployment compensation benefits. As previously noted, at the time Leissring was laid off from her fulltime position, her only employment offer for the following year was to be placed on an oncall substitute teaching list. Leissring's opportunity for steady and economically viable employment for that year was speculative at best. An offer to be placed on a substitute teaching list, with no guarantee that she would teach even one day or receive any wages, is a far cry from the fulltime teaching position Leissring had the preceding year, which was governed by contract and which ensured that she would receive a salary of more than $8,000. The terms and conditions of her offer to be placed on a substitute teaching list were not reasonably similar to those guaranteed by her employment contract in the preceding year. Because Leissring had no reasonable assurance of performing services in any such capacity within the meaning of sec. 108.04 (17) (a), she is not disqualified under that provision from receiving benefits for weeks 24 through 34 of 1979.

At the time Frey was laid off, he had been offered a contract to perform instructional services for the following year. The terms and conditions of the offered employment were not, however, reasonably similar to those of his employment in the preceding year. Under the terms of the proposed contract, Frey would have gone from fulltime to one-eighth time employment, his salary would have decreased by almost $17,000, and he would

have received substantially fewer fringe benefits. The terms and conditions of the offered employment were not reasonably similar to those of Frey's employment in the preceding year. Frey had no reasonable assurance of performing services in any such capacity within the meaning of sec. 108.04(17)(a), Stats., and is therefore not disqualified under that provision from receiving benefits for weeks 23 through 34 of 1981.

*By the Court.*—The judgment of the circuit court in no. 82–1409 is reversed and cause remanded to the Labor and Industry Review Commission for further action consistent with this opinion. The judgment of the circuit court in no. 82–1913 is affirmed.